Counsel for the appellant. Thank you, your honor. My name is Adair Dyer. I'm counsel for the appellant, Demetrius Papakosmos. Excuse my voice somewhat. I had a little bit of a cold. It affected the voice some. I understand that I have 20 minutes and that I would like to reserve. But you don't have to use it all. I understand that, your honor, and I'll try to do the best I can. But I'd like to reserve five minutes for rebuttal, if I can. Just watch the clock. In this circuit, we have a downward counting clock that shows you 19 and a half minutes left when you get down to around whatever the time is that you would like to reserve. Thank you, your honor. This case is an international treaty case. It involves what is the first international family law treaty that the United States ever joined. The U.S. joined this treaty in 1988 under the Reagan administration. It ratified the treaty, passed implementing legislation. The treaty's been enforced now since 1988. In other words, coming out of 1988. It calls for expedited hearings on these issues. And I noticed that over two years has gone by. And did you ever make any effort to accelerate the hearing on this case? Your honor, I requested, put a request. There was a request even at the end of my brief. There was a request by letter for expedited hearing. I was told that it was necessary to file a motion. I did not file a motion. I was very concerned to put this case in the hands of a motions panel that hadn't seen the entire record. So, for that reason, I did not file a motion. So, you're not burdened then by the passage of time, particularly? I am burdened by the passage of time. But I will explain, your honor, that this treaty is designed to return children who have been taken abroad by one parent, contrary to the custody rights of the other parent. It's a reciprocal treaty for the U.S. We get children back from abroad. The State Department is our central authority for getting children back from foreign countries under this treaty. And the National Center for Missing and Exploited Children acts for the State Department in the United States in helping to get children back sent back abroad. In this case, the family had moved from California to the- I think we're pretty well acquainted with the facts. Perhaps you might want to go straight to the issue of whether or not Judge Morrow's findings were clearly erroneous with respect to the parents having a subtle intention to adopt Grieves. Your honor, the- it's, of course, difficult to make the standard are clearly erroneous, but it was also decided in the leading case on habitual residence, which is Moses versus Moses, the Ninth Circuit case, which was the opinion by Judge Kozinski in 2001. It was decided then that the standard review that this habitual residence is a mixed question of law and fact, that therefore the narrative facts found by the district judge will be subject to the clearly erroneous standard, but that on the conclusions of law, including the legal conclusion of whether- where the children's habitual residence was, that that will be reviewed de novo by the court. So that it's a mixed standard, as I think your honor knows, going back to a case from this court. But even if there were to review it de novo, what would you rely on in the record before Judge Morrow to persuade us that she was wrong? Well, I think there I would look towards my appellate brief and towards the reply brief. Judge Morrow found numerous findings, most of them being against my client, but the one matter that she ignored was, and did not make findings on, was that the appellee had filed suit in the Greek courts on March 16th, 2004. She filed suit in the Greek courts, seeking custody of the children, alimony, child support, occupancy of the family home, as she called it. And she had every possibility at that time to claim that there- that she had come to Greek on a conditional basis. Judge Morrow's findings had to do, in the end, with the idea that the appellee had come to Greece on a conditional basis. It's not always clear what that condition was. It was that she wasn't satisfied. But she did present some witnesses, too. Did she? The appellee did present some witnesses that she had told that she was going just on a trial basis, and the court believed that. You know, I mean, both of them, your client said, I was planning to stay there. She said, I was going on a trial basis, and then the court heard witnesses. And there's clearly- there's clearly some credibility findings that went on here. And what the court believed, and what the court didn't believe. Your Honor- That's always trouble for an appellate court. I think you know that. Yes. Your Honor, some of those witnesses testified that they had the impression that this was a temporary move. And Judge Kosinski and Moses talked about temporary moves, because there was a temporary move in that case. A move in which there was a clear period of time in Moses. It was 15 months, and the mother had filed for custody earlier than the end of that 15-month period. But here, in this case, there was no period of time. In fact, as I understand it, and as I've pointed out in my reply brief, I think that the other side has abandoned the idea that there was any temporary move. They've gone along with what is the idea that this was a conditional move. But it's still not clear what the condition was. And those witnesses did not testify what the condition was, either. The- Well, it sort of reads a little bit like a TV series in terms of, you know, on the facts of the, you know, the case. And I think what the children were there a total of four months. They were there from December until April. And then they moved three times, I think, during that four-month period. And then we have the entrance of, I don't know, Slema Boudoir, and the wife not wanting to have the mistress living in the house. And, but the children had previously lived in the United States. How long? They had lived essentially all their lives in the United States before. And then the mother left once during that period, too, didn't she? The mother left once during that period of time. She came back. And after the period, after the incident which she tried to claim that the father had slashed her and the- That was the domestic violence claims. Expert testimony that was given by a very distinguished surgeon showed that he had never seen a domestic violence cut that was not like that described in the report, the surgeon's report, that he had only seen that those were typical of self-inflicted wounds. So, yes, it reads like a- Well, but then, but there were certain credibility findings that the court had to make going through that process, and the court could have actually made them against the appellee and said that no, I think based on all of this, you did intend, you know, you were intending to move there. You were intending to stay there. And then your position went sideways when the Selima Boudoir situation came up. And if the court had said, well, no, you intended to move there permanently, it was a move and all of that, and I'm going to find for your client they would be in the same position that you're in, we'd still have to wrestle with all of these credibility findings. Well, there's one thing that doesn't require any credibility findings as I see it, which Mrs. Papakosmos filed in Greece on the 16th of March. This was after the so-called incident. It was long after the question of whether she had a, came with a condition or not. She filed, and she made an open-ended claim for custody, child support, alimony, the family home occupancy and everything. She didn't mention nothing about any condition. This was long before we went to trial. Later we went to trial before Judge Barrow, but this was long before we went to trial that she had filed suit in Greece for custody and for quite a lot of money in fact. And she had not mentioned anything about a condition, not mentioned anything about a right to go back to the United States, not mentioned anything about wanting to go back to the United States. Counsel, wouldn't that be one indicium which needs to be taken into account with others such as the fact that children went to school in an English-speaking school, not a Greek-speaking school, the number of moves, as Judge Callahan mentioned. These are all elements to be taken into account, I take it, in terms of the big picture, or are you arguing that the suit in Greece is dispositive of this case? Well, I'm arguing that the, that Mrs. Propper-Cosmas in effect waived her, any condition that there was by filing this suit without mentioning the condition, without asking for a return to the United States. Well, what if the court looked at it in a way and said, okay, this woman doesn't want to leave without her children, and she knows that the father has some rights to the children, so she wants to make sure that, you know, that she doesn't, you know, cause some sort of international, you know, that they meet you in Florida, that in swoop, you know, the forces swoop on you and take your children, so she says, well, I want to make sure I can take my kids with me, and so I'm going to try to do that. I mean, that's another way to look at it, and if the court looked at it that way, then it isn't necessarily dispositive in your favor. Well, I'm not sure that I even say that it's dispositive, but what I'm saying is that the judge seems to have paid no attention to that, and that this is a subsequent. What the judge did, in her opinion, was to break down the habitual residence, first of all, as to the intent at the time when they left, and she found, and I think she made some rather curious inferences at that point. She found, however, that the mother had, in her mind at least, a condition when she moved to Greece, but the judge also broke down the later part and said, after they got to Greece, there was essentially no change, that there was not, that the mother never really accepted the idea of being in Greece, and yet that's completely contradicted by the suit that she filed, which may even be judicial estoppel, in effect, her going and making an inconsistent statement in court, which she later made in the federal court in the United States. So, I'm only saying that this court, dealing with this case de novo, as you do, as far as the legal conclusions are concerned, and that involves the legal conclusion as to where the habitual residence was, perhaps some of the sub-elements of that, such as whether there was a condition. Condition has legal content to it, the word does. The word abandoned, there was a question of whether they had abandoned their California residence. I think that the Greek suit, in effect, is another sort of capstone evidence that she had abandoned her California residence at that time. She didn't ask to go back. She could have asked the Greek court to go back, but she didn't do it. Yes, Your Honor. But what I hear you arguing is something that we're all accustomed to, where a person can immediately become a resident of wherever they're situated if they intend to remain there indefinitely. And that is almost an instantaneous achievement of residency. Now, this, we're concerned with habitual residence, habitual residence. And we're talking about the child. The child has to be a habitual resident of Greece, right? Yes. Now, obviously, we're concerned with the habitual part of that. And what does that mean in the context of this child's development and assimilation into culture and all of those things that we sometimes get concerned with? And we're faced with all of this discussion about the intent and the conduct of the parents, and then these children are placed in Greece for a very short time in a culture that's strange to them. And if we focus on the habitual resident of the child, isn't that what this whole scheme is intended to achieve by not disrupting these children to strange cultures and so on? And that the significance of habitual as it relates to resident has some significance from the standpoint of the child. Now, is that off the chart? Certainly not off the chart, Your Honor. But these children were not completely taken to a strange, otherworldly environment in Greece. They had visited there a number of times over the years. They had relatives. Their father had roots in Greece. That's where he went back. His hotel business in Hollywood, which he had been running hotels, owned a couple of hotels, had a hostel, which he had leased. Those businesses had gone bad following 9-11 because the tourist trade fell off. So he decided that he needed to go back to his roots. Where his family lived in a little town of Ore, O-R-E-I. I don't know whether I pronounced that rightly or not. To go back to that town where his mother lived, where he had roots, where he could grow olives, in fact. And so it's not that they had no roots there. Those children, when they first got back in December of 2003, they went to Ore to the warmth of their family home there. And then they went to Athens in part because, and got a place in Athens, in part so that the children could transition in terms of language. That is, that they didn't have fluency in the Greek language. They obviously had some background in the Greek culture from having a Greek father who had both citizenships, U.S. and Greek. But this is, this is, they had roots there, in other words, and it was not just a strange place for them. And they had the warmth of family in that place. Council, you're down to three-and-a-half minutes, which you may reserve if you would. I'd like to reserve my time, Your Honor. Thank you. We'll hear from Council. Good morning, Your Honors. May it please the Court. Elizabeth Briseño Velasco, and I'll spell that for you, B-R-I-C-E-N-O hyphen V-E-L-A-S-C-O. And I'm for Yvette Papakosmos-Apavie in this case. And, Your Honor, I will focus first and foremost on a couple of issues raised by Council for Mr. Papakosmos, and then I will submit on the brief, mainly the cause of action that was filed by my client in Greece. What Council has neglected to state is that it was accompanied with a restraining order request. And as Your Honors are well aware, even in this state and in this country, you can make a request for protection and make additional requests for support, custody, and visitation. So the main impetus for the request in that state court was for protection of herself and the children after the domestic violence incident had occurred. Additionally, what's important to note is that my client's mother had returned to the country to handle things here in the United States that had been left pending and open, which led the court in the district court to rely on the fact that it was a conditional basis move. When she returned, that is when she learned from the minor child, Angela, that the mistress who Mr. Papakosmos had had an affair with in the United States was now in Greece and was being told by her husband, Mr. Papakosmos, you're pretty much going to have to live with it because she's not going anywhere. At that time, she realized she couldn't go anywhere. She didn't have possession of her or the children's past supports. And she was not going to be leaving them, as Your Honor has noted. She was not going to be leaving without the children. Unfortunately, the incident on February 14th, which ironically is Valentine's Day, occurred and caused her to be in fear of her life. She was hospitalized, had to find an attorney, had no transportation to and from, and at that point made the request for a restraining order along with requests for the support of her children so she could maintain them. One other important thing is if these children had close ties or cultural roots to this country, then it would be logical that father who wanted to start an olive business as he contended in the lower court, that he would have gone straight to where his fields are, olive fields. But he didn't. He went to Athens, never gave an explanation for that. Once in Athens, he uprooted the family again without any notice in one day once the domestic violence incident had occurred and once the restraining order had been granted and he had gotten an attorney who dismissed it. Once he had succeeded, he now intended to even furthermore seclude her and move her approximately two to three hours away in Oreie, which is where his family was. And these children had seen this family on an occasional basis growing up, but they had lived and grown up here in the United States. The other issue that the counsel has not raised and is raising for the first, I mean, that raised for the first time in this court was that my client waived her right to claim that it was a conditional move and that she be stopped from claiming that the children were wrongfully removed. And the counsel raised that on behalf of his client for the first time in this court. And the court below would not have made any findings on that issue because it was not raised in the lower court. It's being raised for the first time here. And I submit on the briefs, I will answer any questions that you may have, Your Honors. No questions. Thank you, Counsel. Mr. Dyer, you have some reserved time. Thank you, Your Honor. The matter of the sliced wrist was tried before Judge Morrow. We had, on behalf of my client, an expert witness, a surgeon who testified that he was extremely experienced in these matters, had dealt with a great deal of domestic violence, that he had never seen any wound as described like this that resulted from domestic violence of a male on a female, but that it was very characteristic of self-inflicted wounds. As a result, in any case, Judge Morrow did not make any finding. Well, what did that have to do with her credibility, right? That had to do, among other things, with her credibility, yes. And Judge Morrow did not make any finding on that. Well. Except that it was a troubled marriage, obviously. All right. But the legal issue that she had to find was the habitual residence, right? And you presented that, I'm assuming, to show that Mrs. Papakosmos was not credible because she made this other thing up, so therefore, she wouldn't be credible on the other issues, right? I'm also answering the other side that claims that my client did that wound. And I'm simply saying that that was not found by Judge Morrow and that the testimony, the evidence, the expert evidence, was contrary to that, in fact. In any case, there is a, on this conditional move, as I say, Judge Kosinski very carefully laid out the conditions on a temporary move, the idea of a temporary move and how you went about seeing whether that resulted in the acquisition of habitual residence. Conditional moves, as they're so-called, however, have gotten a little bit out of hand. And you have a case from the 11th Circuit, I believe, Ruiz versus Tenorio, where the family lived for two years and ten months in Mexico. And they decided that this was a conditional move, that the mother never really wanted to go to Mexico. And that she came back and, therefore, she had the right to bring the children back. There are limits on what you can consider to be the holding of a condition. And, as I say, in this case, I think there's very strong evidence that, in this case, when she went to court, she ignored this condition. She ignored the right to go back to the United States. She ignored any idea that she would go back to the United States. You correct me now if I'm wrong, but my understanding is that, in her action filed in Greece, she never alleged that she was a resident of Greece, am I right? That there's no allegation of fact that she claimed to be a resident? I don't believe that she claimed to be a resident. She did ask for the place where they were living to be given to her, as the family home. Yes. But a little different from what we would see in the typical petition for divorce here, where a person alleges residency for the purpose of jurisdiction. We don't have that in this case, am I right? Yes. I don't know the reason for that. It was drawn up by a Greek lawyer. I do know that in the, many of the European countries, that they look to nationality for personal status rather than domicile or residence in many cases. The court was asked for a temporary restraining order, and that was granted. A three-day temporary restraining order, and then there was a hearing, and then the judge found that there was not enough evidence on the, that this slush food had been caused by the client. So he dismissed, that is, he dissolved the temporary restraining order. There was a further hearing set for May, but Mrs. Papakosmos short-circuited that, in effect, by taking the children and leaving the country. Thank you, Counselor. Your time has expired. Thank you, Your Honor. The case just argued will be submitted for decision, and the court will adjourn.
judges: O'scannlain, Levy , Callahan